IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CT-3077-FL

|  |  |  |
|---|---|---|
| TREVOR MOHAMMED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| DENNIS DANIELS, WHITNEY DRIVER, DONALD MICKLOS, JOHN HERRING, ROBERT OWENS, JACKIE PARKER, ENNIS OATS, DONALD POLT, PAULA SMITH, CARLTON JOYNER, BOBBY MARSHALL, ROBERT LEWIS, and REBEKAH MICKLOS, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

The matter comes before the court on defendants' respective motions for summary judgment (DE 105, 108, 109) pursuant to Federal Rule of Civil Procedure 56. The issues raised were fully briefed and are ripe for adjudication. For the following reasons, the court grants defendants' respective motions.

## STATEMENT OF THE CASE

On April 10, 2013, plaintiff, a state inmate, filed this civil rights action *pro se* pursuant to 42 U.S.C. § 1983. On November 8, 2013, the court entered an order directing plaintiff to particularize his complaint. Plaintiff filed his particularized complaint on December 2, 2013, and named the following defendants: Dennis Daniels ("Daniels"), the Administrator at Maury Correctional Institution ("Maury"); John Herring ("Herring"), the former Assistant Administrator at Maury; Dr. Robert Owens ("Owens"), a physician at Maury; Dr. Donald Vaughn Micklos

("Micklos"), a physician at Pender Correctional Institution ("Pender"); Whitney Driver ("Driver"), a Clinical Dietician employed by the North Carolina Department of Public Safety ("DPS"); Jackie Parker ("Parker"), the Chief of the Food and Nutrition Management Section for DPS; Ennis Oats ("Oats"), the former Administrator at Pender; Donald Polt ("Polt"), the Nursing Supervisor for DPS; Paula Smith ("Smith"), the Chief of Health Services for DPS; Carlton Joyner ("Joyner"), the Administrator at Harnett Correctional Institution ("Harnett"); Bobby Marshall ("Marshall"), the former Assistant Superintendent at Harnett; and Robert Lewis ("Lewis"), the former Director of Prisons. Plaintiff alleged the following claims arising at three correctional institutions, Harnett, Maury, and Pender: (1) deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution; (2) deliberate indifference to his prison conditions in violation of the Eighth Amendment to the United States Constitution; (3) interference with his right to practice his religion in violation of the First Amendment to the United States Constitution; (4) deprivation of liberty and property interests in violation of the Due Process Clause of the Fourteenth Amendment; (5) retaliation in violation of the First Amendment; and (6) discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiff requested declaratory, injunctive, and monetary relief.

On May 7, 2014, the court allowed plaintiff to proceed with his claims. On June 5, 2014, the court entered a consent order, filed by defendant Owens, controlling the production of confidential documents, material, and information. On June 16, 2014, plaintiff filed a motion for a temporary restraining order, which the court denied. Defendants Owens and Micklos subsequently filed respective motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiff failed to state a claim upon which relief may be granted. The court denied both

2

motions.        On April 14, 2015, plaintiff filed a motion to appoint counsel, which the court denied. Plaintiff then filed a motion for leave to file a supplemental amended complaint. Defendants Daniels, Driver, Herring, Joyner, Lewis, Marshall, Oats, Parker, Polt, and Smith responded to plaintiff's motion to amend. Plaintiff filed a reply. On June 4, 2015, plaintiff filed his proposed supplemental amended complaint. Defendants responded to plaintiff's proposed supplemental amended complaint. On July 9, 2015, plaintiff objected to Micklos' response to plaintiff's supplemental amended complaint.

Also on July 9, 2015, the court entered an order granting a motion for an extension of the dispositive motion deadline filed by defendants Micklos and Owens. The court also granted plaintiff's motion to amend, conducted a frivolity review of plaintiff's amended pleading, and directed plaintiff to particularize his amended complaint. Plaintiff then filed a response in opposition to defendants' motion for an extension of time. Plaintiff additionally filed a motion to compel discovery, and a motion for an extension of time to prepare and file dispositive motions. Plaintiff's motion to compel was fully briefed. On August 12, 2015, the court entered an order noting that plaintiff failed to respond to the court's July 9, 2015, order allowing him to file a particularized complaint. Accordingly, the court dismissed plaintiff's amended complaint without prejudice. The court also denied plaintiff's motion to compel, but granted plaintiff's motion for an extension of the dispositive motion deadline. The court subsequently denied plaintiff's motion seeking reconsideration of its August 12, 2015, denial of plaintiff's motion to compel. Plaintiff then filed a motion for sanctions and motion for entry of default, which were denied.

On October 6, 2015, defendants Micklos and Owens filed their respective motions for summary judgment, arguing that plaintiff is unable to establish a constitutional violation.

3

Alternatively, defendants assert the affirmative defense of qualified immunity. Defendants Micklos and Owens attached to their respective motions, their personal affidavits, plaintiff's external movement log, and pertinent portions of plaintiff's medical records. On the same date, the remaining defendants filed a motion for summary judgment arguing that plaintiff is unable to establish a constitutional violation. The remaining defendants attached the following documents to their motion: personal affidavits from defendants Carlton, Daniels, Driver, Parker, Smith, Wells, Polt; pertinent portions of plaintiff's medical records; disciplinary records; various letters; administrative remedy documentation; memorandums from defendant Marshall; plaintiff's list of infractions; portions of DPS's policies and procedures; photographs of plaintiff's property; and documents related to a North Carolina State tort action litigated by plaintiff. The motions were fully briefed. In support of his response to defendants' motions for summary judgment, plaintiff attached the following: a letter from plaintiff to Ms. Hendren; a personal declaration; and a declaration by Maury inmate Joe Brown. Finally, after counsel for defendant Micklos filed a suggestion of death on behalf of defendant Micklos, Rebekah Micklos, the Executrix of defendant Micklos' estate, was substituted as the proper party.

## STATEMENT OF FACTS

The facts viewed in the light most favorable to plaintiff may be summarized as follows. Plaintiff's claims arose over the course of his incarceration at three separate institutions–Harnett, Maury, and Pender. (Compl. (DE 7), pp. 3-6). The court begins with the facts relating to plaintiff's complaints arising at Harnett at around July 12, 2011. (Owens Aff. Ex. 2, p. 2). Plaintiff's allegations at Harnett primarily stem from plaintiff's ability to possess personal property. During the relevant time period, Harnett policy provided that inmates were permitted to possess no more

4

than three shipping bags of personal property at one time. (Joyner Aff. ¶ 7). In the event an inmate possessed excess property, he would be provided the opportunity to reduce his property and to choose which items to keep as long as such items did not exceed the "three shipping bags" limitation. (Id. at ¶¶ 7, 8).

During his incarceration at Harnett, plaintiff possessed excessive property including 19 shipping bags of property. (Id. p. 9). On July 12, 2011, Officer Cadrette initiated a search of plaintiff's property after another inmate reported that plaintiff possessed excessive property. (Joyner Aff. Ex. A, pp. 1, 6). Plaintiff states that he refused to cooperate with the search because Officer Cadrette refused to provide plaintiff an explanation for her presence in his cell. (Id. pp. 2, 14). Plaintiff additionally admits that he refused Officer Cadrette's direct order to pack his personal property because it was too heavy for him to pack on his own. (Id. p. 15). Instead, correctional officers packed plaintiff's property, and transported it to operations for storage. (Id. p. 2). Officers permitted plaintiff to take his prescribed medications and medical equipment with him to the segregation unit. (Id. Ex. B, p. 19).

As a result of the July 12, 2011, incident, Harnett prison officials charged plaintiff with two disciplinary offenses–a C-03 charge for disobeying an order and a D-07 charge for possessing unauthorized or excess property. (Id. pp. 1-2). Plaintiff then was transferred to administrative segregation pending the investigation into his disciplinary charges. (Id. p. 2). Plaintiff's C-03 and D-07 disciplinary charges ultimately were dismissed due to "conflicting statements written by staff." (Id. Ex. A, p. 1).

After the confiscation of plaintiff's personal property on July 12, 2011, Harnett correctional officers provided plaintiff three opportunities–on July 15, 2011, July 16, 2011, and August 4,

5

2011–to be transported from Harnett's segregation unit to the operations building in order to sort through his property . (Id. Ex. B, C, D, p. 1). On each occasion, plaintiff refused to submit to leg restraints stating that he was experiencing "medical problems" or dizziness. (Id. ¶ 14 and Ex. B, pp. 20, 27; C, D, pp. 1-2). After each incident, plaintiff was charged with a C-03 disciplinary offense for disobeying Harnett's standard operating procedure which required that inmates assigned to segregation be in full restraints when escorted outside of the segregation unit. (Id. ¶ 14; Ex. B, pp. 1, 27; Ex. C, pp. 1-2; Ex. D, p. 1). In the course of his disciplinary proceedings, plaintiff repeatedly stated that he had a medical order directing that he be restrained with soft restraints, but the disciplinary hearing officer ("DHO") determined that no such order existed during the relevant time period. (Id. ¶ 18; Ex. B, pp. 9, 27; Ex. C, pp. 1, 7; Ex. D, p. 9). Plaintiff ultimately was found guilty of each of the charged offenses. (Id. Ex. B, pp. 25, 27; Ex. C, p. 18; Ex. D, p. 1). On August 24, 2011, plaintiff was transferred from Harnett to Maury. (Owens Aff. Ex. 2, p. 2).

After arriving at Maury on August 24, 2011, a nurse performed a medical health screening of plaintiff and noted that plaintiff was receiving treatment for arthritis, his left shoulder, knees, and testicles. (Owens Aff. ¶ 8 and Ex. 3, pp. 1-2). The nurse also noted that plaintiff had an allergy to the medications Tylenol, Percogesic, and Ibuprofen, and that plaintiff used a hearing aid, glasses, a cane, and braces. (Id.) Additionally, plaintiff informed the nurse that he was on a therapeutic vegetarian diet and was lactose intolerant. (Id.) After conducting the assessment, the nurse determined that plaintiff should be housed in general population. (Id.)

On August 25, 2011, defendant Owens conducted a review of plaintiff's chart and noted that on August 16, 2011, a physician's assistant at Harnett ordered that plaintiff undergo a complete blood count ("CBC") and a comprehensive metabolic panel ("CMP") in response to plaintiff's

complaints of nausea, weakness, and vertigo.  (Id. ¶ 9 and Ex. 4).  After Owens discovered that the

CBC and CMP had not been performed at Harnett, the tests were performed at Maury on September

1, 2011.  (Id. ¶10 and Ex. 5).  Owens reviewed plaintiff's test results the next day, and assessed that

plaintiff had eosinophilia (an elevated number of eosinophilia white blood cells in plaintiff's blood),

which Owens determined was common given plaintiff's history of allergic rhinitis.  (Id.)

On September 2, 2011, physician's assistant Jerry Leggett ("Leggett") reviewed plaintiff's

chart and noted that plaintiff's prescription for Oxycodone (opioid pain reliever) would expire the

next day.  (Id. ¶ 11 and Ex. 5).  Leggett then referred plaintiff's chart to Owens for review, and

permitted plaintiff to continue taking the medication pending Owens' review.  (Id.)  Owens

approved plaintiff's Oxycodone renewal for an additional 30 days on September 12, 2011.  (Id. ¶

12 and Ex. 5).  Owens also presented plaintiff a narcotic analgesic contract for non-terminally ill

inmates, which plaintiff signed.  (Id.)  Owens again continued plaintiff's Oxycodone prescription

for an additional 30 days on October 10, 2011.  (Id. ¶ 13 and Ex. 6).

On October 24, 2011, plaintiff was seen by a nurse in response to three sick call appointment

requests submitted on September 23, 2011, October 13, 2011, and October 18, 2011, in which

plaintiff requested medical orders renewing his prescriptions for Periactin (antihistamine),

Flunisolide nasal spray (corticosteriod), Phenylephrine (decongestant), Glucosamine (supplement

to ease joint pain), eye drops, Omeprazole (also known as Prilosec, an acid inhibitor), a scrotum

support, back brace, ankle braces, extra mattress, and extra pillows.  (Id. ¶ 15 and Ex. 8).  During

his examination, the nurse noted that plaintiff's Periactin and Flunisolide expired on September 25,

2011, the ankle braces expired on September 28, 2011, and plaintiff's Prilosec expired on October

23, 2011.  (Id.)  The nurse assessed plaintiff with health-seeking behavior related to medication

renewal, and instructed plaintiff to return to the clinic as needed. (Id.) The nurse did not refer plaintiff to Owens for treatment at that time. (Id.)

On October 25, 2011, Owens reviewed plaintiff's chart, and altered the times that plaintiff was scheduled to receive his Oxycodone doses. (Id. ¶ 16 and Ex. 9). Owens again reviewed plaintiff chart on October 28, 2011, and ordered the following: (1) 4 mg of Periactin for six months; (2) Nasarel for six months; (3) extra mattress for one year; (4) extra pillow for one year; (5) new ankle braces every six months for a period of one year; and (6) replace Omeprazole with 20 mg of Pepcid taken by mouth twice a day for six months. (Id. ¶ 17 and Ex. 9). Owens also noted that plaintiff's prescriptions for Glucosamine, Phenylephrine, and a back brace were still valid. (Id.)

On November 9, 2011, Owens reviewed plaintiff's chart, and renewed plaintiff's Oxycodone prescription for another 30 days. (Id. ¶ 18 and Ex. 9). Owens further ordered that each Oxycodone pill be crushed and administered under direct observation. (Id.) On November 14, 2011, Owens renewed plaintiff's prescription for Glucosamine/Chondroitin. (Id. ¶ 19 and Ex. 9). Plaintiff failed to appear for two sick call appointments in November 2011. (Id. ¶ 20 and Ex. 10).

On November 30, 2011, a nurse examined plaintiff in response to a November 22, 2011, sick call request in which plaintiff asked for a renewal of the medication Phenylephrine and eye drops. (Id. ¶ 21 and Ex. 10). Plaintiff complained during his appointment that he received only one ankle brace when he should have received two. (Id. ¶ 20 and Ex. 10). Plaintiff also requested a pair of headphones. (Id.) The nurse advised plaintiff that he would be referred to the optometrist for his eyes and to the camp physician for his medication renewals as well as his headphone request. (Id.) On December 2, 2011, Owens ordered a second ankle brace, 10 mg of Phenylephrine (decongestant), and that plaintiff be permitted to purchase headphones to fit over his hearing aid. (Id. ¶ 22 and Exs.

8

9, 10).  Plaintiff saw Dr. Schertzinger in the optometry clinic on December 7, 2011.  (Id. ¶ 23 and Ex. 11).

On December 8, 2011, Owens renewed plaintiff's Oxycodone prescription for an additional 30 days.  (Id. ¶ 24 and Ex. 11).  Owens again ordered that the pills be crushed and administered under direct observation.  (Id.)  Owens then renewed plaintiff's Oxycodone prescription, on January 4, 2012, under the same terms and conditions.  (Id. ¶ 25 and Ex. 11).  On January 15, 2012, plaintiff was seen by a nurse in response to a January 3, 2012, sick call request asking for renewal of his prescriptions for Dr. 2 Shoes, back brace, knee braces, scrotum support, and stockings (TED hose, compression stockings to prevent the occurrence and guard against the further progression of venous disorders).  (Id. ¶ 28 and Ex. 13).  Plaintiff also requested a renewal of his sinus medication because he had been experiencing more frequent sinus headaches.  (Id.)  The nurse referred plaintiff to Owens, who ordered the following:  (1) 2 mg of Cardura per day; (2) a knee brace; and (3) FLA lumbar sacral support.  (Id.)  Owens did not renew the sinus medication because plaintiff's current prescription did not expire until February.  (Id. ¶ 29 and Ex. 11).

On January 19, 2012, plaintiff attended an appointment with Dr. Ateiat Philips ("Dr. Philips"), a psychiatrist.  (Id. ¶ 30 and Exs. 11, 14).  Plaintiff reported an increase in his depressive symptoms and a dysphoric mood.  (Id.).  Dr. Philips increased plaintiff's dose of Wellbutrin SR from 400 mg to 450 mg daily, and discussed with plaintiff the possible side effects.  (Id.).  Then, on January 25, 2012, plaintiff submitted a sick call request for headphones.  (Id. ¶ 32 and Ex. 16).  On February 1, 2012, Owens reviewed plaintiff's chart.  (Id. ¶ 31 and Ex. 15).  Due to the amount of time plaintiff had been taking Oxycodone, Owens determined it was appropriate to begin a controlled taper of the medication.  (Id.).  To begin the taper, Owens reduced plaintiff's Oxycodone

9

dosage from 10 mg three times per day, to 10 mg in the morning, 5 mg at 3:00 p.m., and 10 mg. at bedtime for a period of 30 days. (Id.)

On February 8, 2012, a nurse examined plaintiff in response to plaintiff's complaint that he was lactose intolerant and that the kitchen had substituted his soy milk with regular milk following an institutional lock down. (Id. ¶ 32 and Ex. 16). After examining plaintiff, the nurse noted that plaintiff had been placed on a vegetarian diet on January 14, 2010, with soy milk and no cheese due to his lactose intolerance. (Id.) Plaintiff's therapeutic diet had expired on January 25, 2011. (Id.) On February 10, 2012, Owens ordered that plaintiff receive a nutritional consultation for a therapeutic diet renewal evaluation. (Id. ¶ 34 and Ex. 15).

On February 24, 2012, defendant Driver conducted a nutritional assessment on plaintiff. (Driver Aff. ¶ 9 Ex. A, p. 2). Around the time of his assessment, plaintiff weighed 137 lbs, which was 88% of his ideal body weight. (Id.) Defendant Driver noted that plaintiff previously was on a therapeutic vegetarian diet, but that there were no clinical issues warranting a therapeutic diet at that time. (Id. ¶ 10 and Ex. A, p. 2). Based on her assessment, defendant Driver determined that a regular diet was adequate to meet plaintiff's caloric needs, as long as plaintiff consumed his daily meals.[1] (Id.) Defendant Driver also recommended that plaintiff engage in daily exercise as tolerated and that plaintiff's weight and "labs" be monitored. (Id.) Owens approved defendant Driver's recommendation. (Owens Aff. ¶ 36 and Exs. 15, 16).

On March 1, 2012, defendant Owens reviewed plaintiff's prescription for Oxycodone as it was nearing its expiration, and ordered the following continued taper schedule for a period of 30

---

[1] Driver attests in her affidavit that DPS cafeterias provide non-meat options for inmates on the regular diet. (Id. ¶ 17).

days: 5 mg in the morning; 5 mg at 3:00 p.m.; and 10 mg. at 8:00 pm. (Id.¶ 37 and Ex. 17). The next day, the nurse examined plaintiff in response to a February 29, 2012, sick call request asking for renewal of his pain medication. (Id. ¶ 38 and Ex. 18). The nurse noted that plaintiff's pain medication had been renewed the previous day, and took no further action. (Id.) Later that same day, a nurse met with plaintiff to discuss plaintiff's non-compliance with his Periactin (antihistamine) medication. (Id. Ex. 13). Plaintiff told the nurse that he over sleeps at times, but would try to be more compliant with taking his medication. (Id.)

On March 28, 2012, a nurse responded to a sick-call request submitted by plaintiff seeking renewal of various medications and medical supplies. (Id. ¶ 39 and Exs. 13, 18). The nurse noted that plaintiff's Miralax and Dr. 2 Shoes prescriptions had expired. (Id.) Then, on April 2, 2012, Owens conducted a review of plaintiff's chart. (Id. ¶ 41 and Ex. 17). Owens directed a continued taper of plaintiff's Oxycodone prescription on the following schedule for a period of 30 days: 5 mgs in the morning; 5 mg at 3:00 p.m.; and 5 mg at 8:00 p.m. (Id.) Owens also renewed plaintiff's prescription for Miralax. (Id.) Owens did not address plaintiff's Dr. 2 Shoes renewal request because plaintiff had not expressed any foot-related complaints since plaintiff had been taken off the shoes in November 2011. (Id.)

On April 9, 2012, a nurse responded to three sick call appointment requests submitted by plaintiff on April 3, 2012, April 4, 2012, and April 7, 2012, in which plaintiff complained of pain related to the taper of his pain medication. (Id. ¶ 42 and Ex. 20). Plaintiff also inquired about the status of his Dr. 2 Shoes request. (Id.) Plaintiff, however, failed to appear for his scheduled sick call appointment and no further action was taken. (Id.) A nurse subsequently met with plaintiff on April 4 and 14, 2012, to counsel him regarding his noncompliance with his Periactin prescription.

11

(Id. ¶ 43 and Ex. 20).  Plaintiff informed the nurse that he did not wish to continue taking the medication because it was not effective.  (Id.)  On April 19, 2012, plaintiff refused to have his blood drawn for the lipid test defendant Owens ordered on February 23, 2012.  (Id. ¶ 44 and Ex. 20).  On April 30, 2012,  Owens ordered that plaintiff's Oxycodone taper continue and that plaintiff receive 5 mgs of Oxycodone at bedtime for a period of two weeks, after which plaintiff's Oxycodone prescription would be discontinued.  (Id. ¶ 46 and Ex. 17).  Finally, Owens submitted a Utilization Review ("UR") request for Dr. 2 Shoes on May 8, 2012, which was allowed.  (Id. Ex. 22).

On May 3, 2012, a nurse examined plaintiff who complained of arthritic back pain, shoulder pain, and "sharp" knee pain.  (Id. ¶ 47 and Ex. 23).  Owens then saw plaintiff on May 7, 2012, and concluded that plaintiff suffered from chronic pain due to degenerative joint disease in his shoulders, knees, and back.  (Id. ¶ 48 and Ex. 17).  Owens noted that he was in the process of weaning plaintiff off of Oxycodone, and that plaintiff currently was taking Wellbutrin and Glucosamine to control pain.  (Id.)  Owens further noted that Tylenol and Ibuprofen caused plaintiff to break out with a rash. (Id.)  Owens assessed plaintiff with chronic pain secondary to degenerative joint disease and prescribed the following:  (1) special wash; (2) one large scrotal support; (3) Glucosamine'/Chondroitin; (4) trial of Nortriptyline (antidepressant used for chronic pain); and (5) batteries for his hearing aid.  (Id.)  Plaintiff failed to appear for a subsequent sick-call appointment on May 9, 2012.  (Id. ¶ 49 and Ex. 24).  On May 15, 2012, Dr. Phillips saw plaintiff and noted that plaintiff's treatment for his depressive symptoms was adequate and that plaintiff had improved since his Wellbutrin dosage had been increased.  (Id. ¶ 50 and Ex. 25).

On May 22, 2012, a nurse met with plaintiff to counsel him regarding his refusal to take his prescribed medication Nortriptyline.  (Id. ¶ 51 and Ex. 26).  Plaintiff informed the nurse that he did

not want to take the medication because it was an antidepressant and he was already taking Wellbutrin for depression and did not want to overdose. (Id.) Plaintiff made clear to the nurse that he was not refusing pain medication, but asked that he instead be prescribed a pain medication which was not related to mental health. (Id.) Owens then reviewed plaintiff's chart and noted that Nortriptyline could work well with Wellbutrin for treatment of chronic pain. (Id.¶ 52 and Ex. 17). Owens assessed plaintiff with drug-seeking behavior because plaintiff wanted only narcotic medication for his pain. (Id.) Owens noted that long term use of narcotic medication to treat chronic pain associated with degenerative joint disease was not preferred. (Id.) Owens discontinued plaintiff's prescription for Nortriptyline because of plaintiff's refusal to take the medication, and planned to follow up with plaintiff regarding his pain as needed. (Id.)

On June 6, 2012, a nurse examined plaintiff in response to a sick-call request regarding plaintiff's pain medication. (Id.¶ 53 and Ex. 26). Owens reviewed plaintiff's chart two days later and noted that plaintiff refused Topamax (used to treat his migraine headaches) and only wanted narcotic medication to treat his pain related to degenerative joint disease. (Id. ¶ 54 and Ex. 17). Owens, instead, offered plaintiff Nortriptyline for his pain. (Id.) Plaintiff subsequently attended a follow-up appointment with Dr. Philips, and Dr. Philips decreased plaintiff's Wellbutrin dosage from 450 mg to 300 mg per day. (Id. ¶ 55 and Ex. 25).

On July 2, 2012, plaintiff submitted a sick-call request complaining of pain and requested Oxycodone. (Id. ¶ 56 and Ex. 28). Ten days later, a nurse met with plaintiff to counsel him regarding his non-compliance with his Wellbutrin and Topamax prescriptions. (Id. ¶ 57 and Ex. 26). In response, plaintiff stated that custody staff would not open his cell door to permit him to obtain his medications, in retaliation for a grievance plaintiff had filed. (Id.) The nurse in turn contacted

the sergeant on plaintiff's unit, and the sergeant stated that he would investigate the issue. (Id.) Defendant Owens subsequently renewed plaintiff's Topamax prescription. (Id. ¶ 59 and Ex. 28).

On August 23, 2012, Owen examined plaintiff in response to plaintiff's complaints regarding pain and bleeding with his bowel movements. (Id. ¶ 63 and Ex. 30). Plaintiff also complained of left shoulder pain, and of symptoms related to gastroesophageal reflux disease ("GERD") for which he requested pain medication. (Id.) Owens assessed plaintiff with left shoulder pain, rectal bleeding, and GERD. (Id.) Owens ordered that plaintiff undergo a CBC, CMP, urinalysis, a left shoulder x-ray, and an x-ray of his kidneys, ureter, and bladder ("KUB"). (Id.) Owens also ordered Zantac for plaintiff's GERD symptoms. (Id.) The results of plaintiff's KUB x-ray were normal. (Id.¶ 64 and Ex. 30). Plaintiff was non-compliant with medical staff's efforts to obtain samples for his CBC, CMP, and urinalysis. (Id. ¶ 65 and Ex. 30).

As for plaintiff's left shoulder x-ray results, the radiologists noted that there was an "[a]ccessory ossicle [small bone and no fracture] at the superior aspect of the acromioclavicular joint" and "lateral downsloping of the distal acromion," which could be associated with rotator cuff disease. (Id. ¶ 66 and Ex. 30). Owens reviewed the x-ray results on September 10, 2012, and ordered a follow-up appointment to discuss the results with plaintiff. (Id.) Plaintiff was transferred from Maury to Pender on September 25, 2012, before the follow-up appointment was scheduled. (Id. ¶¶ 66, 68 and Ex. 2).

On September 25, 2012, a nurse at Pender performed a health screening of plaintiff. (Micklos Aff. ¶ 8 and Ex. 3). Plaintiff informed the nurse that he was receiving treatment for pain in his back and testicle, as well as treatment for arthritis in his left shoulder and knees. (Id.) The nurse documented that plaintiff was taking Wellbutrin (antidepressant), Cardura (alpha blocker used

to treat high blood pressure and urinary retention), and Topamax (for migraine headaches as well as pain management). (Id.) Plaintiff refused to answer several of the nurses questions in the course of the screening. (Id.) Pender staff noted that plaintiff possessed several medical devices, including a cane, arm and knee sleeves (braces), wrist braces, a scrotal support, and back wraps with bands. (Id.) On October 3, 2012, defendant Micklos conducted an Intake Physical Exam and PULHEAT[2] System assessment. (Id. ¶ 9 and Ex. 4). After examining plaintiff, defendant Micklos rated plaintiff's physical capabilities as moderately deficient, assessed that his upper extremities had minimal functional loss, and that his lower extremities had moderate functional loss due to his arthritis history. (Id.) In light of plaintiff's osteoarthritis and the ratings assigned in the PULHEAT system assessment, defendant Micklos ordered the following restrictions for plaintiff's activities: (1) standing limited to 2 hours at one time and 4 hours for any 8 hour period; (2) sitting unlimited; (3) no climbing; (4) lifting limited to 25 pounds; and (5) pushing/pulling limited to 50 pounds. (Id.) Owens further noted that plaintiff should receive a bottom bunk assignment. (Id.) Finally, Owens ordered that plaintiff receive a complete CBC, CMP, prostate-specific antigen ("PSA"), and a lipid test. (Id.)

Later on October 1, 2012, plaintiff submitted a sick-call request complaining of various ailments, including shoulder pain and requested the renewal of several medications and equipment. (Id.) Plaintiff also inquired about the results of his Maury shoulder x-ray. (Id.) On October 6, 2012, plaintiff submitted a sick call request asking for a change in housing to be closer to the medical building. (Id. ¶ 10 and Ex. 5). Two days later, a nurse examined plaintiff. (Id.) Plaintiff told the nurse that he needed to be relocated closer to the medical building because the distance caused

_____

[2] (P) physical capabilities; (U) upper extremities; (L) lower extremities; (H) hearing; (E) eyes; (A) activity; and (T) transportation. (Micklos Aff. ¶ 9, n.3).

problems with his arthritis and shortness of breath. (Id.) On the same date, Micklos reviewed plaintiff's chart and ordered a chest x-ray. (Id.) Then, on October 9, 2012, a nurse reported that plaintiff refused to have his blood drawn for the lab tests Micklos ordered on October 3, 2012. (Id. ¶ 11 and Ex. 6).

On October 9, 2012, radiologist Dr. Pinzon reviewed the results of plaintiff's chest x-ray and noted atelectasis (decrease or loss of air in the lung) in the lung bases and granulomatous changes. (Id.) Dr. Pinzon determined that plaintiff's x-rays did not show any evidence of confluent infiltrate or abnormal density in plaintiff's lungs. (Id.) Based upon plaintiff's x-ray results, defendant Micklos determined that no further action was required due to the fact that atelectasis often subsides without treatment. (Id.) Defendant Micklos further did not alter plaintiff's activity restrictions due to his belief that moderate ambulation would likely help clear plaintiff's chest. (Id.) Defendant Micklos conducted a review of plaintiff's chart on October 18, 2012, and ordered that plaintiff continue to wear compression socks and 10 mg of Claritin. (Id. ¶ 12 and Ex. 7).

On October 19, 2012, plaintiff again complained about the distance he had to walk in order to get to the medical clinic to obtain his medications. (Id. ¶ 13 and Ex. 8). A nurse examined plaintiff on October 24, 2012, and assessed him with chronic pain related to his joints. (Id.) The nurse also noted that, at Maury, defendant Owens had ordered a follow-up appointment with plaintiff to review his x-ray results. (Id.) The nurse referred plaintiff to defendant Micklos in order to review the results of plaintiff's shoulder x-ray. (Id.) Micklos noted that plaintiff's chart did not contain plaintiff's prior shoulder x-ray results, and ordered a repeat x-ray of plaintiff's shoulder. (Id. ¶ 14 and Exs. 8, 9). Plaintiff's new x-ray results showed evidence of degenerative changes about the acromioclavicular joint, which was narrowed. (Id. ¶ 16 and Ex. Ex. 11). There was also

a small bone density at the superior margin of the acromioclavicular joint, but no evidence of any fracture or dislocation. (Id.) Dr. Loraine O'Connor, a psychiatrist, examined plaintiff on November 6, 2012, and changed plaintiff's Wellbutrin dosage from 300 mg to 150 mg. (Id.)

Defendant Micklos examined plaintiff on November 8, 2012, and noted that plaintiff had a history of a shoulder repair. (Id. ¶ 17 and Ex. 8). (Id.) Micklos further noted that plaintiff had a tender left shoulder with loss of motion to extension. (Id.) Micklos assessed plaintiff with recurrent joint pain in the left shoulder, and administered an injection of 80 mg of methylprednisolone (anti-inflammatory substance for intramuscular, intra-articular, soft tissue, or intralesional injection) with 1cc of Lidocaine. (Id.) Finally, Micklos ordered the following: (1) discontinue glucosamine; (2) Tylenol; (3) extra pillow and blanket; (4) Claritin; and (5) Miralax (to prevent constipation). (Id.) The next day, Micklos revoked plaintiff's prescription for Tylenol because plaintiff's was allergic to that medication. (Id. ¶ 18 and Ex. 12). Micklos instead prescribed Tramadol or Ultram (narcotic-like pain reliever). (Id.) Micklos submitted a UR request for the Ultram. (Id.)

On November 19, 2012, Micklos reviewed plaintiff's chart and ordered an additional set of thermal underwear in response to plaintiff's complaint that the cold increased his pain. (Id. ¶ 20 and Ex. 12). Micklos additionally determined that it was not necessary to alter plaintiff's pain medications, despite plaintiff's recent complaints of pain, because plaintiff already had a prescription for Codeine and there was a pending UR request for Ultram. (Id.) On November 25, 2012, a nurse reported that plaintiff refused to take his Codeine and morning dose of Wellbutrin. (Id. ¶ 21 and Ex. 14). Plaintiff complained to a nurse that the staff was "experimenting on him." (Id.) Plaintiff further stated that he would not take the Wellbutrin if it was crushed. (Id.)

On November 26, 2012, a utilization reviewer contacted Micklos regarding the pending UR request for Ultram.  (Id. ¶ 22 and Ex. 12).  The reviewer informed Micklos that the concurrent administration of Wellbutrin and Ultram might increase the occurrence of toxic effects and seizure. (Id.)  In response, Micklos indicated that plaintiff had been refusing to take his prescribed Wellbutrin and that, should plaintiff's refusal continue, Micklos would discontinue plaintiff's Wellbutrin prescription.  (Id.)  Micklos also discontinued plaintiff's prescription for Codeine based upon plaintiff's complaints of itching.  (Id. and Ex. 15).

On December 12, 2012, Micklos provided further information to the utilization reviewer regarding the pending Ultram request.  (Id. ¶ 23 and Exs. 12).  Specifically, the reviewer requested clarification of plaintiff's chronic pain and inquired as to whether a pain management contract had been entered.  (Id.)  Micklos informed the reviewer that plaintiff had chronic pain in his shoulder due to an old injury and that plaintiff had not yet entered into a pain management contract at Pender. (Id.)  Plaintiff then signed a pain management contract on December 13, 2012, and the UR request for Ultram was approved on December 21, 2012.  (Id. and Ex. 16).

On December 14, 2012, a nurse examined plaintiff in response to a December 9, 2012, sick call request complaining about swelling in his feet and legs, as well as severe pain.  (Id. ¶ 25 and Ex. 18.)  Plaintiff complained to the nurse that he was forced to walk long distances and requested a handicapped card.  (Id.)  The nurse assessed plaintiff with lower leg edema and referred plaintiff to the physician.  (Id.)  Micklos examined plaintiff on December 17, 2012.  (Id. ¶ 26 and Ex. 19). Micklos assessed plaintiff with bilateral pedal edema and ordered 90 mg of Lasix (diuretic) daily. (Id.)  Micklos also ordered a CBC and CMP to monitor plaintiff's pain medication and instructed plaintiff to wear his knee brace except when going to meals.  (Id.)  Micklos ordered that plaintiff

18

return for a follow-up appointment in 10 days. (Id.) Plaintiff refused to have his blood drawn for the laboratory tests Micklos ordered on December 17, 2012. (Id. ¶ 27 and Ex. 20).

Micklos conducted a follow-up examination with plaintiff on December 31, 2012. (Id. ¶ 28 and Ex. 19). Micklos noted that it appeared that the Lasix medication had worked to decrease plaintiff's swelling in the extremities. (Id.) As a result, Micklos lowered plaintiff's dosage of Lasix to 20 mgs and ordered Eucerin cream. (Id.) Micklos re-ordered the CMP and CBC. (Id.) Plaintiff again refused to have his blood drawn. (Id. ¶ 29 and Ex. 21). Micklos was advised of plaintiff's refusal on January 14, 2013. (Id. ¶ 30 and Exs. 16, 19). Micklos, in turn, determined that plaintiff's refusals violated the narcotics contract, which stated that in order for an inmate to continue to receive narcotic pain mediation, the inmate must "[c]omply with all treatment, medical tests, and evaluations including mental health evaluations recommended by [his] healthcare provider." (Id.) Due to plaintiff's refusal to submit to laboratory testing, Micklos terminated plaintiff's Ultram prescription. (Id.) On February 27, 2013, plaintiff was transferred back to Maury. (Id. ¶ 33.)

On February 27, 2013, a nurse performed a health screening of plaintiff at Maury. (Owens Aff. ¶ 69 and Ex. 32). The nurse noted that plaintiff was receiving treatment for a dislocated shoulder, bilateral knee cartilage, chronic back arthritis, and migraines. (Id.) The nurse further noted that plaintiff was taking Wellbutrin, Zantac, Hydrocerin, Lasix, Topamax, Miralax, and Claritin. (Id.) Plaintiff reported swelling in his legs, shortness of breath, and increased fatigue. (Id.) Plaintiff also reported that he was on a vegan diet and that he was lactose intolerant. (Id.) Owens ordered that plaintiff attend a follow-up appointment with Leggett to address plaintiff's complaints. (Id. ¶ 70 and Ex. 33).

On March 5, 2012, plaintiff was seen by Physician Assistant Certified, S. Emler ("Emler"), instead of Leggett. (Id. ¶ 71 and Ex. 33). Emler assessed plaintiff with degenerative joint disease with chronic pain, fatigue, and constipation. (Id.) In response to plaintiff's request for a diet change, Emler referred plaintiff to a dietician. (Id.) For plaintiff's complaints of left shoulder pain, Emler ordered a physical therapy consultation in an effort to increase plaintiff's active and passive range of motion in his left shoulder. (Id.) Emler noted that plaintiff was malingering to some degree. (Id. ¶ 72 and Ex. 33). Emler ordered CBC, CMP, B12, folic acid, and TSH tests to rule out anemia given plaintiff's history of hematochezia and vegetarian diet. (Id.) Due to plaintiff's reported hematochezia, Emler also ordered a guaiac fecal occult blood test. (Id.) Plaintiff refused to give samples for the CBC, CMP, B12, folic acid, and TSH tests. (Id. ¶ 73 and Ex. 33). In response to plaintiff's complaints of left shoulder pain, defendant Owens ordered a DC-490 directing that plaintiff be handcuffed in the front for a period of one year beginning on March 21, 2013. (Id. ¶ 75 and Ex. 34).

On March 13, 2013, plaintiff submitted a grievance stating that Maury correctional staff refused to "carry out valid medical order prescribed by licensed physician for issuance of extra pillow, extra blanket, thermals and hearing aid batteries." (Daniels Aff. Ex. D, p. 1). Maury officials provided plaintiff the following response on April 4, 2013:

> An investigation at Maury [] including a review of a statement received from N. Russo, RN., Lead Nurse reveals that inmate was reviewed and notes that he was seen today in nurse sick call in which a DC490 for thermals, extra p[i]llow, and extra blanket were rewritten. These items are dispensed from the warehouse. The hearing aid was filled by the pharmacy on 3/11/13 and sent to the camp and he picked it up at the window on 03/13/13.

(Id. p. 2).

In the interim, on March 25, 2013, defendant Driver conducted a nutritional assessment for plaintiff. (Driver Aff. ¶ 9 and Ex. A). Defendant Driver noted that plaintiff weighed 135 lbs, which was 87% of his ideal body weight. (Id. Ex. A, p. 3). Driver reported that there were no further diagnoses or lab work that showed that a continuation of a therapeutic diet was warranted. (Id.) Driver noted that plaintiff had a history of a vegetarian diet, but concluded that a regular diet was sufficient to meet plaintiff's caloric needs. (Id.) Two days later, Owens prescribed plaintiff Zantac and Cardura. (Id. ¶ 77 and Ex. 35).

On July 8, 2013, plaintiff submitted a grievance at Maury complaining that correctional staff refused to provide him access to his legal and religious property. (Daniels Aff. Ex. H). In particular, plaintiff states that correctional staff did not permit him to posses a Quran during the month of Ramadan. (Id.) Prison officials provided the following response:

> In response to your grievance # 0004, Investigations into your accusation revealed that you were brought to my office and you were shown your property which contained hardback books. I informed you that according to policy hardback or spiral-bound publication are not authorized while assigned to HCON, MCON, ICON or Disciplinary Segregation because of the potential for such to be used as a weapon. . . . You were also offered a soft back Quran while you are assigned to MCON and you were given carbon paper to assist you with your legal work. If you need writing paper please asked the staff on Gray Unit or I when I am making rounds and you will receive same.

(Id.)

## DISCUSSION

A.     Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden

of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

B.      Analysis

In support of their motions for summary judgment, defendants assert the affirmative defense of qualified immunity. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The court first determines whether plaintiff is able to establish a constitutional violation.

1.      Eighth Amendment Medical Claims

Plaintiff alleges defendants Owens, Micklos, Driver, Smith, Parker, and Lewis acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.'" Strickler v.

Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The first prong is an objective one–the prisoner must show that "the deprivation of [a] basic human need was *objectively* sufficiently serious"–and the second prong is subjective–the prisoner must show that "*subjectively* the officials act[ed] with a sufficiently culpable state of mind." See Strickler, 989 F.2d at 1379 (internal quotations omitted).

With the exception of plaintiff's claim against defendant Driver, discussed further below, the court assumes, without deciding, that plaintiff is able to satisfy the objective prong of the Eighth Amendment test for his medical-related claims. The court instead focuses its inquiry on the subjective prong of the Eighth Amendment test–whether defendants acted with deliberate indifference to plaintiff's serious medical needs. Deliberate indifference "sets a particularly high bar to recovery." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). As stated, "deliberate indifference entails something more than negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." See Farmer v. Brennan, 511 U.S. 825, 835 (1994). It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. Id. at 837; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995). An inmate is not entitled to choose his course of treatment. See Russell v. Sheffer, 528 F.2d 318, 318-19 (4th Cir. 1975) (per curiam). Likewise, mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. Estelle v. Gamble, 429 U.S. 97, 105-106 (1976); Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998). In determining whether a prison official is deliberately indifferent to a prisoner's serious medical needs, the court generally may rely on medical records concerning examination and treatment of the inmate. See Bennett v. Reed, 534 F. Supp. 83, 87 (E.D.N.C. 1981), aff'd, 676 F.2d

690 (4th Cir. 1982); see also, Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment."). The court now will address plaintiff's Eighth Amendment claims against each defendant in turn.

a.    Maury defendants

Plaintiff asserts that defendant Owens acted with deliberate indifference to plaintiff's complaints of pain and abruptly discontinued his pain medication. The record, however, belies plaintiff's contention on both counts. In particular, the record reflects that Owens evaluated plaintiff's pain medications on multiple occasions and prescribed several pain medications including Oxycodone, Glucosamine/Chondroitin, Nortriptyline, and Topamax. (Owens Aff. ¶¶ 31, 37, 41, 81and Exs. 15, 17, 19). Owens additionally prescribed plaintiff several medical devices to assist with plaintiff's pain management including ankle braces, knee braces, a back brace, an extra mattress, and an extra pillow. (Id.) The record further reflects that Owens ultimately decided to discontinue plaintiff's Oxycodone prescription, through a gradual taper, based on Owens' belief that "it is preferable to treat with a non-narcotic mediation to control pain, if possible, particularly in light of the potential for addiction and abuse of narcotic pain medication among inmates." (Id. ¶ 31). Plaintiff's disagreement with Owens' decisions with respect to plaintiff's pain management does not rise to a level of deliberate indifference. See Johnson, 145 F.3d at 169; Baker v. Stevenson, 605 F. App'x 514, 520 (6th Cir. Mar. 30, 2015) (upholding the dismissal of a deliberate indifference claim brought by an inmate who was denied access to opiate medications based on his history of substance abuse); see also; Cassell v. Dawkins, No. 5:10CV69–03–MU, 2010 WL 2266972, at *2 (W.D.N.C.

June 3, 2010) (finding no deliberate indifference where the physician took the inmate off at least one highly addictive narcotic medication and put him on another pain medication) (citations omitted), aff'd, 397 F. App'x 849 (4th Cir. 2010).

Plaintiff additionally asserts that defendant Owens prescribed him an antidepressant despite the fact that plaintiff already was taking an antidepressant prescribed by a psychiatrist. The record reflects that Dr. Philips, a psychiatrist, prescribed plaintiff the antidepressant Wellbutrin, and monitored plaintiff while he was taking the medication. (Owens Aff. ¶¶ 30, 55; and Exs. 14, 27). The record further reflects that defendant Owens prescribed plaintiff the medication Nortriptyline, which is an antidepressant, due to Owens' belief that the medication would be beneficial for plaintiff's pain management. (Id. ¶ 52 and Exs. 17, 25, 26). As stated, plaintiff's disagreement with defendant Owens' pain management plan fails to establish an Eighth Amendment claim. Russell, 528 F.2d at 319.

In addition to his claims against defendant Owens, plaintiff alleged medical related claims against Maury staff. Plaintiff first asserts that he had difficulty utilizing the sick call system at Maury. Simply put, this claim is belied by the record in that plaintiff received extensive medical care while at Maury. (See Owens Aff. and Exs.). Further, plaintiff has not provided any evidence to suggest that he had any difficulties with obtaining medical care at Maury, and his voluminous medical records reflect that he did not.

Plaintiff also alleges that Maury's medical staff failed to carry out physician orders to re-fill self medications, failed to dispense controlled medications, and changed the dispensation and dosages of his medications. The court notes that these allegations are directed at unknown medical

25

staff and not defendant Owens.[3]  A § 1983 plaintiff must allege the personal involvement of a

defendant.  See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Monell v. Dep't of Soc. Servs.,

436 U.S. 658, 691–92 (1978).  Further, plaintiff failed to provide factual or evidentiary support for

this claim, including any dates, times, or names of medical staff.  Thus, plaintiff failed to establish

an Eighth Amendment violation for these claims.  See Iqbal, 556 U.S. at 681 (citation omitted); see,

e.g., White v. White, 886 F.2d 721, 723 (4th Cir.1989) (stating minimum level of factual support

required).

Finally, plaintiff asserts that Maury medical staff failed to carry out prescribed orders for

refills of self-medications, failed to dispense controlled medications, and changed medication

dispensation times and dosages.  Plaintiff also asserts that Maury medical staff failed to let him out

of his cell to retrieve medications or for meals.  As stated above, when plaintiff filed grievances

regarding missing items from medical orders, Maury staff was responsive.  (Daniels Aff. Ex. D).

Further, the record reflects that plaintiff received extensive medical care while at Maury.  (See

Owens Aff).  Moreover, a review of plaintiff's nutritional assessments reflects that plaintiff

maintained a stable weight from December 23, 2010, through August 26, 2013. (Driver Aff. Ex. A).

Most importantly, plaintiff has not provided any factual support or evidence for these claims.

Specifically, plaintiff does not specify which medications or meals he missed, any dates, or party

who was responsible for the alleged conduct.  See Ashcroft, 556 U.S. at 681; see, e.g., White, 886

F.2d at 723.  Thus, plaintiff fails to establish a constitutional violation.  Because plaintiff failed to

---

[3] The court notes that Owens periodically changed the dispensation times and dosages of plaintiff's various medications.  To the extent plaintiff raises an Eighth Amendment claim arising out of any such change, plaintiff's disagreement with Owen's decisions with respect to the administration of plaintiff's medications is insufficient to state a constitutional claim.  See Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975).

satisfy the subjective prong of the Eighth Amendment test for his claims against Owens or medical claims arising at Maury, defendants are entitled to qualified immunity for these claims.

        b.      Pender Defendants

Plaintiff alleges the following Eighth Amendment medical claims against the Pender defendants: (1) defendant Micklos "secretly" extended his activity restrictions from 200 yards to a half mile without any type of diagnosis; (2) Micklos failed to provide plaintiff with appropriate follow-up treatment for plaintiff's shoulder; (3) Micklos discontinued plaintiff's prescription for Glucosamine without cause; (4) medical staff refused plaintiff a bed board; (5) a "provider" discontinued plaintiff's special wash in retaliation for filing a grievance; and (6) Polt refused to honor plaintiff's medical order for a bed board. The court now will address each of plaintiff's Eighth Amendment claims against the Pender defendants in turn.

Regarding plaintiff's claim that Micklos "secretly" extended his activity restrictions from 200 yards to half a mile without any type of diagnosis, this claim is belied by the record. Specifically, the record reflects that Micklos conducted a physical examination and PULHEAT system evaluation in order to assess plaintiff's activity restrictions. (Micklos Aff. ¶ 9 and Ex. 4). The record further reflects that defendant Micklos believed that "moderate ambulation" was beneficial to plaintiff's medical condition. (Id. ¶ 11 and Ex. 6). Given Micklos' detailed medical assessments and provision of medical care to plaintiff at Pender, plaintiff's allegations amount to nothing more than a disagreement with Micklos' treatment plan, and are not actionable pursuant to § 1983. See Russell, 528 F.2d at 319.

The record, additionally, belies plaintiff's remaining claims against Micklos. For instance, it is clear that Micklos provided plaintiff treatment for his shoulder condition, including a follow-up

x-ray and injection of methylprednisolone.[4] (Micklos Aff. ¶¶ 14, 17 and Exs. 8, 9, 11). Further, when Micklos discontinued plaintiff's prescription for Glucosamine, he substituted the medication with Ultram (a narcotic like medication). (Id. ¶ 18 and Ex. 9). With respect to the bed board and special wash, Micklos did not prescribe these items for plaintiff because, after conducting medical examinations and numerous chart reviews, Micklos did not believe plaintiff's medical condition warranted such items. Additionally, there is no evidence supporting plaintiff's contention that Micklos' decision not to prescribe such items was retaliatory. (Id. ¶ 34); Adams v. Rice, 40 F.3d 72, 74–75 (4th Cir. 1994) (finding a plaintiff must allege specific facts supporting the claim of retaliation).

Again, in light of the extensive and responsive medical care that Micklos provided plaintiff, plaintiff's disagreements with Micklos' medical decisions are not actionable pursuant to § 1983. See Russell, 528 F.2d at 319. Additionally, even if Micklos' treatment of plaintiff was not effective, it does not give rise to a constitutional violation. See, e.g., Russell, 528 F.2d at 319; Johnson, 145 F.3d at 167 (finding that negligent acts are not sufficient to establish a constitutional violation); see also, Starling v. United States, 664 F. Supp. 2d 558, 569-70 (D.S.C. 2009) (finding that treating physician does not act with deliberate indifference where he chooses a different course of treatment than that recommended by a specialist). This is particularly true where the record reflects that plaintiff's own non-compliance with medical orders and appointments affected his

---

[4] Plaintiff's contention that Micklos should have conducted an MRI, in addition to the x-ray, also is a disagreement with the course of treatment and is not actionable pursuant to § 1983. See Estelle, 429 U.S. at 107 ("[T]he question whether an x-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of medical judgment. A medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment."); Russell, 528 F.2d at 319.

ability to obtain medical care.  Thus, plaintiff failed to establish that defendant Micklos acted with deliberate indifference.

Finally, plaintiff asserts that defendant Polt refused to honor plaintiff's medical order for a bed board.  Bed boards must be prescribed to an inmate by a physician.  (Polt Aff.¶ 8).  Neither Polt or Wells were authorized to prescribe medications or medical items such as a bed board.  (Wells Aff. ¶ 7; Polt Aff. ¶ 5).  There is no evidence in the record that plaintiff was prescribed a bed board by a physician while at Pender.  (Polt Aff. ¶ 8).  Thus, plaintiff failed to establish a constitutional violation, and Polt is entitled to qualified immunity for this claim.  Because plaintiff failed to establish a constitutional violation with respect to his claims against Micklos or any other Pender defendant, these defendants are entitled to qualified immunity for plaintiff's medical-related claims.

c.      Defendant Driver

Plaintiff asserts that defendant Driver refused to issue him a snack bag, soy milk, or therapeutic diet at Maury.  Beginning with the objective prong of the Eighth Amendment test, plaintiff states that he sustained a three pound weight loss as a result of defendant Driver's diet-related decisions for plaintiff at Maury.  (Am. Compl. (DE 7), p. 8).  Plaintiff was transferred to Maury on August 24, 2011, and remained at Maury until September 25, 2012.  (Owens Aff. Ex. 2, p. 2).  Even at his lowest weight of 127 during this time period, plaintiff's weight was 82 percent of his ideal body weight.  (Driver Aff. Ex. A, pp. 1-4).  (Id. p. 4).  Plaintiff has not provided any evidence to the contrary.  Thus, plaintiff failed to satisfy the objective prong of the Eighth Amendment test for this claim.

The court now turns to the subjective prong of the Eighth Amendment test–whether Driver acted with deliberate indifference to plaintiff's dietary needs.  It is well-settled that inmates have a

right to "nutritionally adequate food, prepared and served under conditions that do not present an immediate danger to the health and well being of the inmates who consume it." Shrader v. White, 761 F.2d 975, 986 (4th Cir. 1985) (internal quotation marks and citations omitted). Inmates, however, do not have a constitutional right to a diet of their choice. See Kemp v. Drago, No. 1:12-1481-JFA-SVH, 2013 WL 4874972, at *9 (D.S.C. Sept. 11, 2013) (finding no Eighth Amendment claim where inmate alleged defendants failed to ensure that plaintiff received a special diet tray for his "Cholinergic Urticaria" which allegedly caused an allergic reaction), aff'd, 558 F. App'x 328 (4th Cir. 2014); see also, Hoffman v. Lincoln County Sheriff's Dept., No. 5:12-cv-89-RJC, 2013 WL 4494709, at *5 (W.D. N.C. Aug. 19, 2013) ("Plaintiff has failed to show how the need of a snack bag constitutes a serious medical need, or that the jail's refusal to provide Plaintiff with a daily snack bag was a denial of the minimal civilized measure of life's necessities.") (internal quotation and citation omitted).

Applying these principles, the court finds that plaintiff has not established an Eighth Amendment violation because there is no evidence that Driver acted with deliberate indifference to plaintiff's diet or health concerns. Rather, the record reflects that Driver monitored plaintiff's weight on a regular basis and assessed plaintiff's nutritional needs while plaintiff was incarcerated at Maury. (Driver Aff. Ex. A). Driver repeatedly determined that plaintiff's weight was within normal limits and that there were no clinical issues warranting a therapeutic diet or a snack bag. (Id. ¶¶ 6, 10 and Ex. A). Thus, there is no evidence in the record to establish that plaintiff was subjected to an extreme deprivation or that defendant Driver neglected a serious medical need.

To the extent plaintiff asserts that he should have received soy milk at Maury due to his alleged lactose intolerance, there is no medical evidence reflecting a diagnosis for lactose intolerance

for plaintiff while at Maury. (Driver Aff. ¶ 14). Further, the record reflects that plaintiff's own actions in refusing to comply with diagnostic laboratory testing made it difficult for the medical defendants to determine whether plaintiff needed accommodations to his diet. (Id. Ex. C). Based upon the foregoing, plaintiff failed to establish that Driver acted with deliberate indifference, and defendant Driver is entitled to qualified immunity.

### 2. Prison Conditions

Plaintiff alleges various prison conditions claims arising at Maury, which include: cold temperatures; difficulty placing a telephone call to the chaplain; and changes to his recreation time. As stated, "[i]n order to make out a prima facie case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler, 989 F.2d at 1379 (internal quotation omitted)). The court now considers plaintiff's prison conditions claims in turn.

### a. Cold Cell Temperature

Plaintiff asserts that he was subjected to a cold cell while at Maury. Generally, cold temperatures alone do not violate the Eighth Amendment. See, e.g., Coil v. Peterkin, No. 1:07CV145, 2009 WL 3247848, at *4 (M.D.N.C. Oct. 5, 2009) (no injury to detainee who "'might' have gotten a cold" where jail provided detainee with extra blankets and cold medication), aff'd, 401 F. App'x 773 (4th Cir. 2010) (per curiam); Williams v. Ozmint, No. 3:08-cv-4139-GRA, 2010 WL 3814287, at *8 (D.S.C. Sept. 23, 2010) (defendants were not deliberately indifferent to plaintiff's placement in a cell which "was 'so cold as to [cause him] to catch a cold or flu'" where they "provided Plaintiff with clothing . . . and ensured that he was monitored by medical personnel").

31

Here, the record reflects that the temperature of the units at Maury was 68 degrees during the relevant time period. (Daniels Aff. ¶ 21). The record further reflects that plaintiff was provided an extra blanket, extra pillow, and thermal underclothes to use in his cell. (Id. ¶ 20 and Ex. D; Pl's Resp. (DE 120), Ex. Ex. B). In any event, plaintiff failed to present evidence that he sustained a significant physical or emotional injury resulting from the alleged cold cell temperatures at Maury. See Strickler, 989 F.2d at 1381 (finding that in order to "withstand summary judgment" on an Eighth Amendment claim, a prisoner "must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions."); White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1993) (prisoner's Eighth Amendment claim should be dismissed if he fails to allege a serious physical or mental injury resulting from the conditions of confinement); see also, Fleming v. Francis, No. 5:13-cv-21991, 2014 WL 2589755, at * (S.D.W. Va. June 10, 2014) (finding that plaintiff failed to state an Eighth Amendment claim where he failed to allege significant physical or emotional injury resulting from the challenged prison conditions) (citations omitted). Based upon the foregoing, plaintiff failed to establish an Eighth Amendment violation with respect to his cell temperature claim.[5]

b.     Telephone Call to Chaplain

Plaintiff claims that his constitutional rights were violated because he was not permitted to make a telephone call to the Chaplain at Maury. This claim is not a model of clarity. It appears plaintiff sought assistance from the Chaplain in order to make a telephone call to his brother and sister who were ill in a hospital in London, England. (Am. Compl. (DE 7), p. 16). "There is no

---

[5] The court notes that plaintiff's cell temperature claim is somewhat confusing. In his complaint, plaintiff complains about cold cell temperatures, but in his response to defendants' motion for summary judgment, he asserts that his cell temperature was too hot.

constitutional or federal statutory right to use a telephone while in prison." United States v. Alkire, No. 95–7885, 1996 WL 166400, at *1 (4th Cir. Apr. 10, 1996); see also, Coil, WL 3247848, at *10 ("Since inmates do not have a constitutional right to telephone access, Defendant's denial of telephone access to Plaintiff is not a ground upon which Plaintiff can be granted relief."), aff'd, 401 F. App'x 773 (4th Cir. 2010). Thus, plaintiff failed to establish a constitutional violation, and defendants are entitled to qualified immunity for this claim.

   c.  Changes to Recreation Time

   Plaintiff contends that Maury correctional staff violated his constitutional rights when they changed his outdoor recreation schedule from afternoon until early morning because the cold temperatures in the early morning made it difficult for him to recreate. The Constitution, however, "'does not mandate comfortable prisons,'" and thus "[p]rison conditions may be 'restrictive and even harsh.'" Farmer, 511 U.S. at 832, 833 (citations omitted); Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988) ("Inmates cannot expect the amenities, conveniences and services of a good hotel."). The court finds that the instant claim fails to arise to a constitutional violation, and defendants are entitled to qualified immunity.

   3.  First Amendment Claims

   Plaintiff alleges that defendants interfered with his ability to access courts and to practice his religion in violation of the First Amendment. The court now examines plaintiff's First Amendment claims in turn.

   a.  Access to Courts

   In support of his access to courts claim, plaintiff asserts that the Maury defendants refused to permit him access to his writing materials or his hard covered legal books while he was in

segregation.  Plaintiff also alleges that the Harnett defendants would not permit him access to his 2008 DPS policy manual.  Finally, plaintiff asserts that the Harnett, Maury, and Pender defendants confiscated his legal materials.

In order to state a claim for denial of access to courts, the inmate must show actual injury or that a defendant's conduct hindered his efforts to pursue a legal claim.  See, e.g., Lewis v. Casey, 518 U.S. 343, 351–52 (1996); Michau v. Charleston County, 434 F.3d 725, 728 (4th Cir. 2006).  The United States Supreme Court held in Lewis that inmates must be provided "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."  Lewis, 518 U.S. at 351 (quotation omitted).  The right to access the courts extends to direct criminal appeals, habeas corpus proceedings, and civil rights actions challenging conditions of confinement. Id. at 354-55.  The actual injury requirement mandates that an inmate "demonstrate that a nonfrivolous legal claim had been frustrated or impeded."  Id. at 353.  The Court did not extend the holding to include the right to "litigate effectively once in court."  Id. at 354 (disclaiming language in Bounds v. Smith, 430 U.S. 817, 825 (1977), suggesting otherwise).

Here, plaintiff has not alleged any injury due to his alleged lack of access to courts.  To the extent plaintiff asserts that the missing 2008 DPS policy manual or any other alleged missing legal materials hindered his ability to litigate his North Carolina State tort claim, his claim is belied by the record.  In particular, the record reflects that plaintiff was able to extensively litigate his tort claim, including his participation in a full evidentiary hearing.  ((DE 109) Ex. 9).  Any contention by plaintiff that he was not able to effectively litigate his tort claim does not violate the constitution. Lewis, 518 U.S. at 354.  Additionally, plaintiff's voluminous filings in this action also belie his contention that he was or is being denied access to courts.  Finally, plaintiff was permitted the

opportunity to sort through his property after it was confiscated pursuant to the respective institutions' property limitation policies. (See Joyner Aff. ¶¶ 7, 8, 9 and Exs. A-D; Daniels Aff.¶ 32; and Wells Aff. ¶¶ 16-21). Based upon the foregoing, plaintiff failed to establish any injury, and there is no constitutional violation. Thus, defendants are entitled to qualified immunity for this claim.

b. Religious Property

The court now turns to plaintiff's contention that he was denied access to his religious property at Harnett or Maury, namely his Quran during the month of Ramadan in violation of the First Amendment. The Free Exercise Clause of the First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. The United States Supreme Court has applied the First Amendment to the states through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is rationally related to furtherance of a legitimate governmental or penal interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner v. Safely, 482 U.S. 78, 89–91 (1987).

In deciding whether a defendant's actions can be sustained as "reasonably related to legitimate penological interests," the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest;

35

(2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89–90.

Here, the record reflects that Harnett prison officials did not prohibit plaintiff from possessing any religious materials, including a Quran. Rather, plaintiff was provided repeated opportunities to sort through his property and to choose any items, within the parameters of Harnett's three shipping bag policy limitation, to store in his cell. Plaintiff, himself, admits in his amended complaint that he was provided two opportunities to access his property at Harnett. (Am. Compl. (DE 7), p. 7). Likewise, Maury officials did not prohibit plaintiff from possessing religious materials. In fact, staff at Maury offered plaintiff a soft back backed copy of a Quran while plaintiff was assigned to the maximum control unit. (Daniels Aff. Ex. H). Such circumstances do not violate the First Amendment. See Gordon v. Mullins, No. 7:12cv00494, 2014 WL 1118199, at *6 (W.D. Va. Mar. 20, 2014) ("Although denying [plaintiff] the ability to choose which books he kept may have made it more difficult, inconvenient, or expensive for him to understand and practice his faith, that does not rise to the level of a substantial burden" for the purposes of the First Amendment.), aff'd, 582 F. App'x 248 (4th Cir. 2014); see also, Garrett v. Gilmore, 926 F. Supp. 554, 557 (W.D. Va. 1996) (upholding prison's limitation on property in inmates' personal areas finding that the prison has a legitimate penological interest in fire safety), aff'd, 103 F.3d 117 (4th Cir. 1996). Thus,

plaintiff failed to establish a constitutional violation, and defendants are entitled to qualified immunity for this claim.[6]

4.    Due Process Claims

Plaintiff asserts several due process claims against the Harnett, Maury, and Pender defendants including:  missing property at Harnett, Maury, and Pender; wrongful demotion to close custody at Harnett; wrongful placement in administrative segregation at Harnett; and deficiencies in the course of disciplinary proceedings at Harnett and Pender.  The court now considers plaintiff's due process claims in turn.

a.    Missing Property

Plaintiff asserts that his 2008 DPS policy manual was missing at Harnett, that his headphones were missing at Pender, and that unspecified other property was confiscated, lost, or stolen at each facility.  To state a procedural or substantive due process claim, an inmate must demonstrate that he was deprived of life, liberty, or property by government action.  <u>Beverati v. Smith</u>, 120 F.3d 500, 502 (4th Cir. 1997).  Beginning with plaintiff's procedural due process claim, he is not entitled to relief because even "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post [-]deprivation remedy for the loss is available."  <u>Hudson v. Palmer</u>, 468 U.S. 517, 533 (1984) (holding that intentional deprivations of property by State employees do not violate due process until and unless the State refuses to provide a suitable post-deprivation

---

[6]  Plaintiff does not assert any specific First Amendment claim arising at Pender.  In any event, the record reflects that plaintiff possessed 15 bags of personal property, which exceeded Pender's three bag policy limitations.  (<u>Id.</u> ¶ 19).  Plaintiff again was offered the opportunity to reduce his personal property, but refused.  (<u>Id.</u> ¶ 20).  There is no evidence that Pender staff prevented plaintiff from accessing his religious materials, and plaintiff has not presented any evidence to the contrary.  Accordingly, Pender defendants also are entitled to qualified immunity for this claim.

remedy); see Mora v. City of Gaithersburg, 519 F.3d 216, 230–31 (4th Cir. 2008). Here, an adequate post-deprivation remedy is available to plaintiff in state court. See, e.g., Wilkins v. Whitaker, 714 F.2d 4, 6–7 (4th Cir. 1983). Because plaintiff has an adequate post-deprivation remedy in state court, his procedural due process claim fails.

As for substantive due process, the Fourth Circuit defines it as "an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement those actions." Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal, Virginia, 135 F.3d 275, 287–88 (4th Cir.1998) (internal quotation omitted). The substantive due process check "is warranted only where no process could cure the deficiencies in the governmental action ... In other words, governmental action offends substantive due process only where the resulting deprivation of life, liberty, or property is so unjust that no amount of fair procedure can rectify it." Id.

Here, the court does not find the alleged deprivation so unjust as to be incapable of avoidance by any procedural protections. Moreover, post-deprivation state remedies are available to plaintiff. Thus, plaintiff has not established a substantive due process violation. See Williams v. Crawford, 449 F. App'x 288, 289 (4th Cir. 2011) ("Because Williams had an adequate post-deprivation remedy under Virginia law for the allegedly wrongful confiscation, his property was not taken without due process."); see also, Calhoun–El v. Maynard, No. RDB–07–220, 2007 WL 5254010, at *n.9 (D. Md. Nov. 19, 2007) ("Further, allegations that a state actor has negligently or intentionally destroyed, lost, or interfered with legal mail or other personal property do not state a procedural due process claim where effective state remedies are available.") (citing Pink v. Lester, 52 F.3d 73 (4th Cir.1995)), aff'd, 267 F. App'x 252 (4th Cir. 2008). Because plaintiff fails to establish a due process

38

claim in connection with his lost, stolen, or confiscated property, defendants are entitled to qualified immunity for these claims.[7]

        b.      Custody Status and Administrative Segregation

Plaintiff asserts that he was demoted to close custody at Harnett for no reason in violation of the Due Process Clause. As stated, the Due Process Clause applies when government action deprives an individual of a legitimate liberty or property interest. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 569 (1972). An inmate does not possess a liberty interest in assignment to a particular custody level or security classification or a place of confinement. See Wilkinson v. Austin, 545 U.S. 209, 221–222 (2005). Rather, the custody placement or classification of state inmates is among the "wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." Meachum v. Fano, 427 U.S. 215, 225 (1976). Based upon the foregoing, plaintiff failed to establish a constitutional violation, and defendants are entitled to qualified immunity as to this claim.

To the extent plaintiff's contests his placement on administrative segregation at any facility, such action does not implicate a constitutionally protected liberty interest.[8] See Beverati, 120 F.3d at 502 ("confinement to administrative segregation does not implicate a liberty interest"). Thus, defendants are entitled to qualified immunity for this claim.

_____

[7] Plaintiff's claim that his 2008 DPS policy manual was missing likewise fails because plaintiff admits that he eventually received a replacement policy manual. (Am. Compl. (DE 7), p. 7). The fact that the replacement manual contained photocopied pages does not rise to the level of a constitutional violation. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) ("[E]xtreme are required to make out a conditions-of-confinement claim.").

[8] The court notes that an inmate may have a liberty interest associated with disciplinary segregation if inmate alleges that the restraints "'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Beverati, 120 F.3d at 502 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995). Plaintiff makes no allegations to support a finding that the conditions in segregation posed an atypical or significant hardship.

c. Disciplinary Proceedings

Plaintiff contends that the disciplinary convictions he received following the July 15, 2011, July 16, 2011, and August 4, 2011 incidents at Harnett violated his due process rights because he was not given the opportunity to produce physical evidence or live witnesses during the disciplinary proceedings. The Due Process Clause mandates several procedural safeguards before an inmate may be punished for violating prison disciplinary rules with the loss of protected liberty interest, such as earned good-time credit. Wolff v. McDonnell, 418 U.S. 539, 557 (1974). These limited due process rights include advanced, written notice of the charges, written findings, and a limited right to call witnesses. See id. at 563-64. However, an inmate only is entitled to these procedural protections when the conviction results in the loss of statutory good-time credits or where some other liberty or property interest is at issue. Id. Additionally, the findings of a prison disciplinary board must be supported by some evidence in the record, Walpole v. Hill, 472 U.S. 445, 454-55 (1985), and be made by an impartial adjudicator. Wolff, 418 U.S. at 570-71.

The court first considers plaintiff's claim that he was not permitted the opportunity to call live witnesses or present evidence. The Fourth Circuit Court of Appeals has held that live witness testimony may be disallowed by a DHO where the testimony would be irrelevant or cumulative. Ward v. Johnson, 690 F.2d 1098, 1112–13 (4th Cir. 1982). Here, the DHO denied plaintiff's requests for live witnesses due to relevance. (Joyner Aff. Exs. B, C, D). The DHO, likewise, determined that plaintiff's proposed evidentiary materials were irrelevant. (Id.) Plaintiff has not submitted any relevant evidentiary materials or witnesses testimony to suggest that the DHO's determinations violated his constitutional rights. Rather, plaintiff makes only conclusory allegations in support of his due process claims.

40

To the extent plaintiff challenges the sufficiency of the evidence used to convict him of the three charged offenses, the record reflects that plaintiff admits in his witness statement that he was uncooperative with the Harnett officer's attempts to escort him from his cell to the operations unit to reduce his property. (Joyner Aff. Exs. B, pp. 20, 27, C, p. 1, 9, 12; D, p. 2). Accordingly, there is "some evidence" to support plaintiff's disciplinary convictions. As a result, the Due Process Clause was not violated. See, e.g., Walpole, 472 U.S. at 454–56. Based upon the foregoing, defendants are entitled to qualified immunity for these claims.

Plaintiff additionally alleges that defendant Polt initiated false disciplinary charges against him at Pender. The record reflects that plaintiff refused to answer questions during a medical screening following his transfer from Maury. (Polt Aff. ¶ 12 and Ex. C). After Polt reported the incident to Pender facility staff, plaintiff was charged with, and found guilty of, a disciplinary infraction for the incident. (Id. ¶ 12). As stated, as long as there is some evidence in the record to support a disciplinary committee's factual findings, a federal court will not review their accuracy. Walpole, 472 U.S. at 454-55; see Moore v. Plaster, 266 F.3d 928, 931–33 (8th Cir. 2001) (retaliatory-discipline claim may proceed where disciplinary action is not supported by "some evidence"); Freeman v. Rideout, 808 F.2d 949, 952–53 (2d Cir. 1986) (holding that, so long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, does not state a claim).[9] Here, plaintiff's medical intake screening form from Pender reflects that plaintiff refused to answer questions during his medical examination, which

---

[9] Plaintiff additionally references eight other disciplinary convictions he received at Pender. However, plaintiff has not alleged how these additional disciplinary proceedings or convictions violate his due process or any other constitutional right. Thus, plaintiff failed to establish a constitutional violation related to such allegations. See Ashcroft, 556 U.S. at 681; White, 886 F.2d at 723.

satisfies the "some evidence" standard. Thus, plaintiff failed to establish a constitutional violation, and defendants are entitled to qualified immunity.

5.      Retaliation

Plaintiff alleges that Maury's medical staff refused to let him out of his cell to receive medication in retaliation for plaintiff filing grievances in violation of the First Amendment. Claims of retaliation are treated with skepticism in the prison context. See Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996). This is "because every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Id. (internal quotations omitted). Accordingly, for an inmate to state a colorable claim of retaliation, the alleged retaliatory action must have been taken with regard to the exercise of some constitutionally protected right, or the retaliatory action itself must violate such a right. Id. at 1318; see Adams, 40 F.3d at 75. Additionally, a plaintiff must allege specific facts supporting the claim of retaliation; bare assertions of retaliation do not establish a claim of constitutional dimension. Adams, 40 F.3d at 74–75. Finally, a plaintiff must show that he "suffered some adversity in response to [his] exercise of protected rights." American Civil Liberties Union of Maryland, Inc. v. Wicomico County Md., 999 F.2d 780, 785 (4th Cir. 1993).

Plaintiff's retaliation claim first fails because inmates do not have a constitutional right to participate in a grievance procedure.[10] See Daye v. Rubenstein, 417 F. App'x. 317, 319 (4th Cir. 2011). Plaintiff further failed to present any evidence or facts to support this claim, such as times, dates, or individuals involved in the alleged conduct. See White, 886 F.2d at 723. Plaintiff additionally failed to connect either defendant Daniels or Herring to the alleged retaliatory conduct.

---

[10]  Because an inmate has no constitutional right to a grievance process, any claim plaintiff seeks to allege arising out of his participation in the grievance process likewise is DISMISSED. See Daye, 417 F. App'x at 319.

Thus, plaintiff failed to establish a constitutional violation, and defendants Daniels and Herring are entitled to qualified immunity for this claim.[11]

6.  Equal Protection Claim

Plaintiff generally asserts that he was subjected to race discrimination in violation of the Equal Protection Clause. The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To that end, the Equal Protection Clause provides that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Generally, in order to establish an Equal Protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. If he makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Veney v. Wyche, 293 F.3d 726, 730–31 (4th Cir. 2002) (internal quotation omitted); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). In a prison context, this level of scrutiny is "whether the disparate treatment is reasonably related to [any] legitimate penological interests." Veney, 293 F.3d at 732 (internal quotation omitted).

Here, plaintiff does not allege that other inmates were treated differently or better than he was, and does not allege that such preferential treatment was due to his race. Plaintiff, additionally, failed to set forth any specific, non-conclusory factual allegations which establish any improper motive. See Williams v. Hansen, 326 F.3d 569, 584 (4th Cir. 2003); Young v. City of Mount

---

[11] To the extent plaintiff alleges a retaliation claim against any other defendant, such claims lacks factual or evidentiary support. Accordingly, defendants are entitled to summary judgment for such claims. See Iqbal, 556 U.S. at 681 (citation omitted); see, e.g., White, 886 F.2d at 723 (stating minimum level of factual support required).

Ranier, 238 F.3d 567, 577 (4th Cir. 2001) ("The presence [] of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint" do not support the legal conclusion.). Thus, plaintiff has not met his burden of demonstrating that he was treated differently from similarly situated inmates. Because plaintiff fails to state a *prima facie* claim for race discrimination, he failed to establish a constitutional violation. Thus, defendants are entitled to qualified immunity.

7.    Respondeat Superior

Plaintiff's allegations against defendants Parker, Smith, and Lewis fail to establish a constitutional violation because they are based upon a theory of respondeat superior, as opposed to supervisory liability. Specifically, plaintiff failed to allege facts sufficient to establish any deliberate indifference, tacit authorization, or any personal involvement whatsoever on behalf of Smith or Lewis with respect to plaintiff's medical claims. See Monell, 436 U.S. at 694 n. 58 (holding that respondeat superior liability is unavailable under § 1983); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (setting forth requirements to properly assert a supervisor liability claim under § 1983). Even if plaintiff alleged supervisor liability claims against these defendants, plaintiff still would not be entitled to relief because there is no underlying constitutional violation. Thus, defendants' motion for summary judgment as to plaintiff's claims against defendants' Parker, Smith, and Lewis is GRANTED.

8.    New Claims

Plaintiff, in his response to defendants' motion for summary judgment, makes several new allegations, which include but are not limited to, his assertion that he is subject to being strip searched before he attends religious services, interference with his legal mail, inappropriate medical

fees, unsanitary cell, refusal to alter his religious diet, and a job-related injury. To the extent plaintiff attempts to allege these or any other new claims in his miscellaneous filings or in response to summary judgment, such claims are not part of this action because plaintiff failed to move to amend his complaint to include any new claims pursuant to Federal Rule of Civil Procedure 15(a).[12] Moreover, permitting plaintiff the opportunity to amend his complaint at this juncture would be prejudicial to defendants. For these reasons, the court does not consider any new claims asserted in plaintiff's miscellaneous filings or in response to defendants' motion for summary judgment as part of this action, and such claims are DISMISSED without prejudice. See United States v. ex rel. DRC, Inc. v. Ouster Battles, LLC, 472 F. Supp. 2d 787, 796 (E.D. Va. 2007) (citing Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292 (9th Cir. 2000)), aff'd 562 F. 3d 295 (4th Cir. Apr. 10, 2009). On a related note, and in an abundance of caution, the court finds that any claims not specifically addressed are nothing more than generalized and conclusory allegations without a basis in fact and meritless. See White, 886 F.2d at 724; see also, Adams, 40 F.3d at 74.

## CONCLUSION

Based upon the foregoing, defendants' respective motions for summary judgment (DE 105, 108, 109) are GRANTED. The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 31st day of August, 2016.

_Louis V. Flanagan_
LOUISE W. FLANAGAN
United States District Judge

---

[12] Plaintiff previously was permitted the opportunity to file a particularized amended complaint on July 9, 2015, but failed to do so. (See (DE 92, 98)).